**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **TONY WASHINGTON, SR.,** | * | **Criminal No. SAG-16-0235** |
| | * | |
| **Defendant.** | * | |
| | * | |
| | * | |
| *        *        *        *        *        *        * | *        *        *        *        * | |

**MEMORANDUM OPINION**

Tony Washington, who is presently in Bureau of Prisons custody serving a sentence of 168 months' incarceration, filed a Motion for Compassionate Release.[1] ECF 686. The Government filed an opposition, ECF 707. Washington has filed a reply and a number of supplemental filings. ECF 704, 712, 714. Finally, at this Court's request, the Government filed updated medical and disciplinary records. ECF 748. Having considered all of those filings, this Court finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons that follow, Washington's Motion will be DENIED.

**I.      Factual Background**

The following facts are derived from the Government's summary of the facts proved at trial, as included in Washington's Amended Presentence Report. ECF 567.

> Between at least July 2015 and April 28, 2016, the defendant, TONY WASHINGTON (hereinafter "WASHINGTON") combined, conspired, confederated, and agreed with co-defendants Jamal Carter, DeAndre Smith, Dymir Rhodes, and with others, to possess with intent to distribute and to distribute heroin and fentanyl. During that time-period, Smith, Rhodes, and Carter managed a drug

---

[1] Washington also filed a motion to appoint counsel, ECF 696. Because Washington has been able to explain the basis for his motion adequately to this Court, this Court finds that appointment of counsel is unwarranted and will deny that motion.

trafficking operation in and around an apartment complex known as "Pedestal Gardens," located at the 300 block of McMechen Avenue, which is within 1,000 feet of the Eutaw Mashburn Elementary School. In addition, Smith, Carter, and Rhodes maintained a "stash" house at 1111 Dlong Road, Catonsville, Maryland. Smith, Carter, and Rhodes used the apartment to store drugs and drug proceeds and to process and package drugs for distribution. WASHINGTON acted as a distributor for the organization and routinely distributed "packs" of heroin and/or fentanyl. Typically, each "pack" contained approximately 50 gel capsules of the drug, or approximately 5 grams.

During the course of the investigation, law enforcement officers obtained authorization to intercept communications over Carter's cellular telephone. Carter routinely communicated with WASHINGTON to discuss the distribution of drugs. On September 26, 2015, Carter contacted WASHINGTON to discuss their drug trafficking operation. WASHINGTON informed Carter that he had drug proceeds to give to Carter ("I was looking for you for real, so I could give you . . . the bread"). Later on September 26, 2015, Carter contacted WASHINGTON and asked him how many packs WASHINGTON had left to sell ("[w]hat you got left"). WASHINGTON responded that he "probably got like 40" packs left and needed more to sell. In another conversation on September 26, 2015, Carter contacted WASHINGTON to discuss when WASHINGTON would need more drugs. Carter directed WASHINGTON to contact him when he was "down to like . . . 15" packs.

On September 26, 2015, WASHINGTON contacted Carter. WASHINGTON stated "what's up boss" and Carter replied that he wanted to discuss the status of drug sales for the day. WASHINGTON reported that one of the organization's distributors was selling the last pack of heroin ("oh yeah that's, that's it. He got the last one"). Carter then wanted to know how much heroin was left in the pack and WASHINGTON reported that he only sold four gel caps ("[h]e said only, only four for real. He only sold four of em").

On October 6, 2015, WASHINGTON contacted Carter and asked him if any member of the organization had "opened" the drug shop for the day. WASHINGTON indicated that he was ready to sell drugs, but that no one else was on the street ("yeah cause there ain't nobody out here. I'm out this bitch. I don't see nobody"). Later on October 6, 2015, WASHINGTON contacted Carter to discuss the operation of a drug shop. WASHINGTON informed Carter that there was a significant number of customers at the drug shop ("but it's like twenty people up this bitch though"). Carter then directed WASHINGTON to have the customers move to "the park" and that Carter was on his way to address the situation.

During the course of the conspiracy, WASHINGTON stored firearms in his residence in furtherance of the conspiracy.

On December 23, 2015, law enforcement officers arrested WASHINGTON at the 200 block of South Broadway Street. Officers discovered approximately eight gel

`

capsules of heroin in WASHINGTON's front vest pocket. After his arrest, WASHINGTON admitted that he sold drugs and stated that he was about to open additional drug shops.

At trial in 2018, a jury found Washington guilty of conspiracy to distribute and possess with intent to distribute 100 kilograms or more of heroin. ECF 518. At sentencing, United States District Judge Catherine C. Blake sentenced Brown to a term of imprisonment of 168 months, to be followed by eight years of supervised release. ECF 593 at 31. Washington now seeks a reduction of his sentence to time served.

## II.   Analysis

As part of the First Step Act, enacted in December, 2018, Congress expanded 18 U.S.C. § 3582(c), permitting courts to reduce an existing term of imprisonment where "extraordinary and compelling reasons warrant such a reduction." *See* 18 U.S.C. § 3582(c)(1)(A)(i) (2018); Pub. L. No. 115-391, tit. VI, § 603(b), 132 Stat. 5194, 5239–41 (2018). While previously, any motion for compassionate release had to be initiated by the Bureau of Prisons ("BOP"), the First Step Act granted defendants the ability to move the Court for a reduction in their sentence for "extraordinary and compelling reasons." *Id.* § 603(b)(1). Before a defendant's motion can be filed with the Court, one of two conditions must be satisfied: (1) the defendant must have exhausted all administrative remedies to appeal the BOP's failure to bring a motion on his behalf, or (2) thirty days must have lapsed "from the receipt of such a request by the warden of the defendant's facility," whichever is earlier.[2] *Id.* Once a motion is for compassionate release is properly filed, the Court follows a three-step inquiry: (1) determining whether "extraordinary and compelling reasons" render the inmate eligible for compassionate release; (2) considering whether the factors set forth in 18 U.S.C. § 3553(a) weigh in favor of a sentence reduction; and (3) ensuring that the reduction is "consistent

---

[2] The Government does not contest that this administrative prerequisite has been satisfied.

`

with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

### a. Extraordinary and Compelling Circumstances

To meet the first element for consideration under the First Step Act, then, Washington needs to demonstrate extraordinary and compelling circumstances. Washington suggests a number of reasons: (1) a disparity between his sentence and that of similarly situated persons, including his co-defendants; (2) pandemic-related concerns; and (3) rehabilitation. None of those factors individually, or when taken in combination, amounts to extraordinary and compelling circumstances.

Taking each in turn, Washington argues that his sentence is disproportionately high compared to similarly situated individuals. *See* ECF 686 at 9 –10. He correctly notes that he would no longer be deemed a career offender if sentenced today. *Id.* at 15. However, at his sentencing, while Judge Blake found him to be a career offender, she expressly declined to sentence him under the career offender guidelines. ECF 593 at 13; 30–31. Instead, she calculated the guidelines as if he were not a career offender and gave him a sentence in the middle of that advisory guideline range. *Id.* at 31. The fact that Washington would no longer qualify as a career offender, then, does not suggest that the sentence Judge Blake imposed is too high.

Second, he argues that he received a disproportionately greater sentence than his co-defendants. ECF 704 at 1. Washington is readily distinguishable from his co-defendants, however, in two significant respects. First, he is the only defendant in the fifteen-defendant case to go to trial, meaning that he did not get credit for acceptance of responsibility, ended up with an obstruction of justice enhancement, and did not negotiate a favorable resolution of his case with the government. *See* ECF 593 at 30. Second, and more importantly, Washington's criminal history

`

is measurably worse than that of any of his co-defendants who received a lesser sentence. *Id.* Washington's prior criminal record placed him in Criminal History Category VI, even without reference to his career offender status. *Id.* Only one of eleven of Washington's co-defendants who received lower sentences earned a category higher than IV, and most were in category III or below. *See, e.g.*, ECF Nos. 193, 283, 293, 297, 528, 549, 395, 421. Accordingly, the discrepancy between his sentence and that of his co-defendants appropriately reflects their different individual circumstances, and is not grounds for reducing his sentence to match theirs.

Washington also cites pandemic-related difficulties as an extraordinary and compelling reason justifying his release. ECF 704 at 2. The BOP's efforts to prevent transmission within its facilities unquestionably presented added hardships to the incarcerated population, as the BOP enacted various measures to best protect and care for its inmates. *See United States v. Hiller*, Cr. No. ELH-18-389, 2020 WL 2041673 at *3–4 (D. Md. Apr. 28, 2020). However, those measures do not create extraordinary and compelling reasons to release all incarcerated individuals. *See, e.g.*, *United States v. Proctor*, Cr. No. DKC 04-160, 2020 WL 1864584 at *2 (D. Md. Apr. 14, 2020) ("The current pandemic state of emergency is of great concern to the entire country . . . Immediate release, however, is not a panacea . . . ."). Moreover, as inoculation is now widespread within BOP facilities, inmates are better protected from complications and some of the more dramatic measures have been alleviated, allowing conditions at BOP facilities to progress closer to pre-pandemic standards.

Certainly, an inmate's particularly acute risk of COVID-19 complications has been deemed to be an extraordinary and compelling reason in certain cases. *See United States v. Kearney*, No. CR ELH-18-17, 2023 WL 2788626, at *15 (D. Md. Apr. 5, 2023) (collecting and summarizing cases). Washington does have a pacemaker and hypertension. At this point several years into the

`

pandemic, however, Washington has contracted COVID-19 more than once. He has a history of refusing medical treatment prescribed by prison medical staff, including blood work, the flu vaccine, and an X-ray on one occasion when he suffered a post-COVID cough (which eventually subsided on its own). ECF 748 at 67. At present, Paxlovid and other medications are available to lessen any person's chance of serious illness and death from COVID-19. And Washington has decided not to take measures to protect himself against more serious complications from COVID-19, as he has declined vaccination. *Id.* In light of his contribution to any increased risk he faces, which this Court deems to be only slight given his prior experiences with mild infection and the availability of relatively effective medications, this Court cannot conclude that the pandemic creates an extraordinary and compelling reason warranting further consideration of Washington's release.

Finally, Washington appears to contend that his rehabilitation warrants a reduced sentence, citing over twenty educational classes and programs he has taken at the BOP. ECF 686 at 13. Rehabilitation alone is not an extraordinary and compelling reason. *See* 28 U.S.C. § 994(t). And even if it were, Washington's rehabilitation, which consists largely of availing himself of educational opportunities within the prison, is not extraordinary, but just an example of the conduct expected of BOP inmates.

This Court has considered all of the factors above, both individually and in combination, and has determined that they are not extraordinary and compelling. Specifically, because this Court finds each factor merits no weight, even considering them in combination does not bring them to an "extraordinary and compelling" level. Accordingly, Washington is ineligible for further consideration of compassionate release.

`

### b.   § 3553(a) Factors

Even had Washington established an extraordinary and compelling reason entitling him to further consideration, 18 U.S.C. § 3553(a) prescribes the factors the Court must assess in determining whether it should reduce a defendant's sentence. *See United States v. Wirsing*, 943 F.3d 175, 183 (4th Cir. 2019); *United States v. Logan*, Cr. No. CCB-10-0203, 2019 WL 3391618 *1 (D. Md. July 26, 2019). Those factors include (1) "the nature and circumstances of the offense;" (2) "the history and characteristics of the defendant;" (3) "the need to protect the public from further crimes of the defendant;" and (4) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). The Court may also consider the defendant's conduct since his conviction, which would include his disciplinary record in prison. *See Logan*, 2019 WL 3391618 at *1.

Beginning with the nature and circumstances of his offense, Washington participated in a large-quantity drug conspiracy, involving firearms and operating near an elementary school. ECF 593 at 29. The extreme danger that conduct poses to the community does not weigh in Washington's favor.

Washington's history and characteristics similarly do not help his cause. Judge Blake noted his "very lengthy criminal history" at sentencing. *Id.* at 30. Beginning with an armed robbery at age 18, Washington has a long history including narcotics distribution, assaults, and violations of supervision. That criminal record placed him in Criminal History Category VI, and led Judge Blake to remark that a lengthy sentence was necessary to "deter or at least incapacitate" Washington out of concern for public safety. *Id.* at 31. Washington's track record in prison corroborates that concern, as he has sustained thirteen infractions since late 2019, to include a serious 100-level infraction in March, 2023. ECF 748-3.

`

This Court certainly recognizes, and does not discount, Washington's participation in various courses during his term of incarceration. But from this Court's perspective, his disciplinary record and ability to comport with rules is the more significant measure. Washington's poor track record gives this Court no assurance that he would comport his behavior with the law if released.

Turning to the third factor, the need to protect the public from further crimes of the defendant, the Court has no confidence that, if released, Washington would abstain from the type of serious criminal conduct that led to this sentence. His continued denial or minimization of his involvement in the offense of conviction undermines any notion that he could be trusted to abide by the law. *See* ECF 686 at 13 (admitting to "serious errors in judgment when he was an adolescences [sic]" but claiming to be innocent of the crime charged and convicted). He also denies or minimizes the disciplinary infractions he accrued in prison, attributing them to "spiteful female staff members who he was in a relationship with." ECF 712 at 3. Engaging in inappropriate relationships with staff members is an entirely separate reason for concern. But given Washington's repeated demonstrated unwillingness to accept responsibility for his wrongdoing, there is an acute continued need to protect the public from his conduct.

The final § 3553(a) factor is the need to avoid unwarranted sentence disparities. As described above, the differences between sentences imposed on the various defendants in Washington's case are attributable to (1) acceptance of responsibility and plea negotiations; (2) each defendant's role in the conspiracy, which varied greatly; and (3) each defendant's criminal history before this conviction. Viewed through those prisms, there is no meaningful discrepancy in this case because none of the co-defendants are particularly similarly situated to Washington. His criminal history is far worse and he received no benefit from a negotiated disposition of his

`

case. It would be the reduction of Washington's sentence to time served which would epitomize an unwarranted sentence disparity.

In total, then, all of the § 3553(a) factors weigh strongly against reducing Washington's sentence, even assuming that he had been able to demonstrate the extraordinary and compelling reason needed to trigger such analysis.

**III.     Conclusion**

In conclusion, after considering all of the relevant factors, this Court concludes that Washington has not established an extraordinary and compelling reason to justify his release, and that even if he had, his current sentence is most appropriate to accomplish the objectives described in 18 U.S.C. § 3553(a).  Accordingly, Washington's Motion for Compassionate Release, ECF 686, is DENIED and his motion to appoint counsel, ECF 696, is also DENIED.

A separate Order will issue.

DATED: June 14, 2023                                        _____/s/_____

                                                                                  Stephanie A. Gallagher
                                                                                  United States District Judge